

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Case No. 04 CR 202 |
| ) | |
| FRANCIS BELL ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Defendant Francis Bell is charged with possession of cocaine and cocaine base with intent to distribute. The alleged cocaine was seized by law enforcement officers on February 23, 2004 from a locked safe inside a hotel room that Bell had rented. Bell contends the seizure was illegal and has moved to suppress the fruits of the search. The Court held an evidentiary hearing on the motion. For the reasons stated below, the Court denies Bell's motion.

The Court has considered all the evidence and has assessed the credibility of the witnesses who testified at the hearing. We find the facts as follows. On February 22, 2004, Norma Morales called the Chicago Police Department to report that her husband, Jesus Colon, had been kidnapped and that she had received a demand for ransom in exchange for his safe return. Chicago police officers began to investigate along with Drug Enforcement Administration agents assigned to a joint DEA - CPD task force.

The kidnappers directed Morales to leave the ransom money at the Chicago Transit Authority's Logan Square station. Law enforcement officers, including DEA agent William Warren, set up undercover surveillance inside the station, with other officers, including Chicago police detective Kenneth Boudreau, conducting visual and video surveillance outside. A little

before 9:30 p.m., Bell was observed inside the station picking up the bag containing the ransom. Warren and other officers approached him and identified themselves. Bell ran out of the station, pursued by Warren and a Chicago police detective. They caught up to Bell after a short distance, and he was tackled. Bell resisted arrest, and a struggle ensued in which Bell was struck more than once. Bell suffered injuries to his face and elsewhere as a result of the struggle. A two-way radio was seized from him during the struggle.

Warren read Bell his rights and placed him into a police car. Bell agreed to speak to Warren. Bell claimed he was homeless and said that a Hispanic male had approached him near the station and offered him $500 to go inside the station, pick up a bag that would be inside, and then throw it over a particular fence outside the station. Bell reported that he had obtained the two-way radio from the same man and that his instructions were to place the radio inside the bag before he threw it over the fence. Warren examined the contents of Bell's wallet and found about $1,000 in currency, as well as two key cards from a Holiday Inn hotel at an unidentified location. Bell was taken to Chicago Police Department Area 3 headquarters, located at Belmont and Western Avenues, where he was placed in an interview room around 10:00 p.m.

Warren, Boudreau, and others canvassed the area near the Logan Square station in an effort to gather more information and, if possible, locate Colon or the kidnappers. This took somewhere between sixty and ninety minutes. The officers learned nothing of value. Warren and Boudreau then traveled separately to Area 3 headquarters, arriving around or a bit after 11:00 p.m.

Before Warren and Boudreau arrived at Area 3, Chicago police officer Henry Harris, the supervisor of the task force, interviewed Bell. Bell gave a version of events similar to the one he

had given to Warren, and he denied any knowledge of the kidnapping. After Warren and Boudreau arrived at Area 3, they and others continued to interview Bell, who remained in the interview room, in handcuffs. Bell continued to repeat the same story. The officers believed that Bell was withholding information and that he knew more about the kidnapping than he claimed.

Around 11:30 p.m., Warren asked Bell about the Holiday Inn room keys that had been found in his wallet. Bell stated that he had been staying at a Holiday Inn near O'Hare Airport with his girlfriend but had already checked out. Warren did not believe Bell and began to call Holiday Inns in the area, asking for Francis Bell's room. At some unspecified time, Warren telephoned the Holiday Inn located at 8201 West Higgins in Chicago, which is near O'Hare Airport. When Warren asked for the room of Francis Bell, the desk clerk put him through. Warren hung up the telephone and reported to DEA agent George Ohlin, another member of the task force, that he believed he had located Bell's hotel room.

Shortly thereafter, Warren and Ohlin left Area 3 and drove to the Holiday Inn, believing the kidnap victim might be at that location. They reasonably believed that the kidnap victim was in imminent danger of physical harm. The ransom drop had failed, and at some point after that, the kidnappers had telephoned Morales, asking why she had not delivered the ransom. The prior implicit threats of harm to Colon remained real and immediate.

The agents arrived at the Holiday Inn around 1:30 a.m., a time duly noted by the desk clerk in her log. As the clerk further noted in the log, the agents identified themselves, presented Bell's driver's license and room key, and asked the clerk to "read" the key to determine what room it would open. The clerk advised them that the key was for Room 204. The agents went to that room and knocked on the door, hoping to find the kidnap victim or information that would

3

help them locate him.

The door to Room 204 was answered by a woman, who identified Bell from a photograph and said she was his girlfriend. She gave the agents permission to search the room. While doing so, the agents came across some plastic wrapping with powder residue on it. The wrapping appeared to Warren to be similar to material sometimes used to wrap kilogram quantities of cocaine.

The agents also observed that the hotel room contained a locked safe about the size of a breadbox. The woman told the agents that she did not have access to the safe. She reported that Bell may have been using the room to deal narcotics and that she believed there were narcotics in the safe. The agents returned to the desk clerk and obtained the access code for the safe. They were aware, and believed, that the safe might contain narcotics, but they also had a reasonable basis to believe that it might contain evidence that would lead them to the kidnap victim or the kidnappers. The agents used the code to open the safe and found a scale, plastic bags, a quantity of suspected cocaine, and a pill bottle. The label on the pill bottle contained the name and address of a woman (not the woman in the hotel room).

The woman also reported that Bell had an automobile which was parked outside. The automobile was searched, but nothing was found. Warren later traveled to the address listed on the pill bottle, still hoping to locate the kidnap victim or information that would lead to him, but this proved to be fruitless.

At some point after the agents had searched the safe, agent Ohlin contacted detective Boudreau by telephone. By this time, Boudreau was no longer at Area 3; he had returned to his home police district to review video tapes taken during the ransom drop, in the hope of sighting

others who might be involved in the kidnapping. Ohlin asked Boudreau to try to obtain Bell's consent to search the hotel room. Boudreau determined that Bell had been taken to Area 5 police headquarters, located at Grand and Central Avenues. He spoke by telephone to Chicago police sergeant Kevin Reppen and asked if Reppen could attempt to obtain Bell's consent to search Room 204 at the Holiday Inn located at 8201 West Higgins in Chicago.

After receiving the call from Boudreau, Reppen, along with Chicago police detective Patrick Purdy, entered the Area 5 interview room where Bell was being held. They advised Bell that they were investigating a kidnapping and asked him to consent to a search of the hotel room where he had been staying. Bell replied that nothing in the room had anything to do with any kidnapping. The officers said that they were trying to locate the kidnap victim. They presented Bell with a consent form. Bell reviewed the form and signed it at approximately 2:15 a.m.

The form read as follows. (The underscored passages represent blanks which the officers had filled in; cursive typeface represents a signature.)

| CONSENT TO SEARCH | DATE | TIME |
| Chicago Police Department | 23 FEB 2004 | 0215 |

I, FRANCIS J. BELL, have been advised of my constitutional right not to have a search made of the premises/vehicle described below without a search warrant first being obtained. I have also been advised of my right to refuse to consent to such a warrantless search.

Having been advised of and fully understanding those rights, I hereby authorize and give my consent to DET. K. BOUDREAU and DET. T. FANNING who have identified themselves as Chicago Police Officers assigned to the HIDTA TASK FORCE / AREA FIVE DETECTIVE DIVISION to conduct a complete search at this time of the premises/vehicle under my lawful control and described as ROOM 204 OF HOLIDAY INN 8201 W. HIGGINS CHICAGO, ILLINOIS.

In addition, I hereby authorize and give my consent to the above named officers to obtain and remove from the searched premises/vehicle any materials, documents,

or other items that may be used in connection with a legitimate law enforcement purpose.

By my signature on this document, I hereby state and certify that this consent to search is being given by me to the above named officers knowingly, voluntarily, and without having received any threats, promises, or duress of any kind.

/s/ *Francis J. Bell*

WITNESSES

*Sgt. K. Reppen 1459*
*Det. P. Purdy #20654*

Bell seeks to suppress the fruits of the search of the hotel room and the safe. He contends that his consent was coerced by physical abuse on the part of the police; that the consent did not extend to the locked safe; and that, in any event, the consent was not obtained until after the search had been conducted. The government argues that the consent was given voluntarily by Bell before the agents entered the hotel room and that it authorized entry and search of not just the room but also containers within the room. In the alternative, the government argues, the search of the room and safe were justified by exigent circumstances, specifically the risk of harm to the kidnap victim if he was not located.

The government bears the burden of showing that Bell's consent was voluntary. *Schneckloth v. Bustamante*, 412 U.S. 218, 222 (1973). It has carried that burden. Bell contends that when he was first presented with the consent form, he was at Area 5 and declined to sign it until after he could speak with an attorney. He claims that no attorney was provided and that when he continued to refuse to sign the form, a police officer charged him and slammed him against a wall and later hit him across the face on several occasions when he continued to refuse

6

to sign the form. Bell also claims that an officer tightened the handcuffs on his left wrist until the skin broke and he began to bleed. He claims his requests for medical attention were refused. On cross examination, Bell testified that Boudreau was the officer who had physically abused him, while a Chicago police detective named Fanning watched. Boudreau denied Bell's claims and said he had questioned Bell only at Area 3 and only together with agent Warren. Warren also denied that Bell had been abused and testified that Bell had never complained about violence or threats.

The Court did not find credible Bell's testimony regarding physical abuse. Photographs of Bell show injuries to his face, but in the Court's view these were consistent with having been caused in the struggle that both Warren and Bell said took place when Bell was tackled and arrested. A physician who examined Bell at Bethany Hospital on the night of February 24 noted swelling on Bell's left wrist.[1] During his testimony, Bell displayed a small scar on his left wrist, about the size of a dime, and he testified it had been caused by the officer's deliberate tightening of the handcuffs. It is likely that the swelling, and perhaps the scar, were in fact caused by handcuffs. But the Court did not find credible Bell's testimony that the handcuffs were deliberately tightened in retaliation for his refusal to sign the consent form.

In any event, Bell's claims of physical abuse were largely immaterial to the voluntariness of his consent. Bell made no claim that the officers who obtained the consent had abused him or that they had threatened him expressly or implicitly. Perhaps more significantly, Bell did not claim during his testimony that he signed the consent form because of intimidation, violence by

---

[1] The physician did not testify at the hearing. Records from Bethany Hospital were introduced, but the physician's notes of the first examination of Bell were partially illegible.

7

the police, or fear or violence.

The Court finds that the government has met its burden of showing that Bell's consent was given voluntarily. In determining whether a defendant's consent was voluntary, courts consider, among other things, the age, intelligence, and education of the defendant; whether he was advised of his constitutional rights; how long he was detained before consenting; whether he consented immediately or only after repeated requests; whether physical coercion was used; and whether he was in police custody at the time. *Schneckloth,* 412 U.S. at 222; *United States v. Cellitti,* 387 F.3d 618, 622 (7th Cir. 2004). No single factor is dispositive; the determination of voluntariness depends on the totality of the circumstances. *Cellitti,* 387 F.3d at 622.

When he signed the consent form at 2:15 a.m., Bell was in custody, and he had been in custody for nearly five hours. It is entirely possible that, as Bell contended, he had been asked to consent to a search and had refused at some earlier point in time. But as the Court has found, there was no physical coercion and no threats or intimidation. In addition, Bell was informed in the form itself (which he read) of his right to decline. He also had some degree of familiarity with the criminal justice system from prior encounters. The evidence, taken as a whole, showed his consent was voluntary.

Bell's girlfriend voluntarily consented to a search of the hotel room, and her consent gave the agents the authority to enter the room. *See generally United States v. Rosario,* 962 F.2d 733, 736-37 (7th Cir. 1992). She lacked, however, the authority to consent to a search of the locked safe. Warren testified that the woman reported that she lacked access to the safe, and the government does not contend otherwise. Likely for this reason, the government properly does not seek to justify the search of the safe based on the woman's consent to the search of the hotel

room. *See United States v. Melgar*, 227 F.3d 1038, 1041-42 (7th Cir. 2000) (consent to search premises does not authorize search of container on the premises if the police have reason to believe that the consenting person lacks authority or control over the container).

Bell's consent, however, was broad enough to permit a search of the safe. "The scope of consent is defined by gauging, under the totality of the circumstances, what a 'typical reasonable person' would have understood it to be." *United States v. Lemmons*, 282 F.3d 920, 924 (7th Cir. 2002) (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). "The scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251.

It is true that Reppen and Purdy obtained Bell's consent by stating that the police were looking for the kidnap victim. Bell subjectively may have believed that his consent would be used only to search the room itself, not the safe. But he did not voice that belief at the time he signed the consent form, and officers placed no limitations on the scope of the consent they were seeking. Specifically, they said nothing that would have led Bell *reasonably* to believe that their search would be limited to seeing if the victim was in the room.

In addition, the form Bell signed authorized "a complete search" of the premises and authorized the officers "to obtain and remove from the searched premises ... any materials ... or other items" that could be used for legitimate law enforcement purposes. *Lemmons* makes it clear that a general consent form cannot authorize an unlimited search of premises when the defendant has been led to believe that the search will be limited. *Lemmons*, 282 F.3d at 924. But that did not occur in this case.

The Court is not persuaded, however, that Bell's consent was obtained before the officers searched the hotel room and the safe. It is undisputed that Bell signed the consent form at 2:15

9

a.m. But the Court finds that the police had entered the hotel room at or around 1:30 a.m. Warren testified that he learned the location of the hotel at, just before, or just after 1:00 a.m., *see* Jan. 21, 2005 Tr. 41, and he also testified that he and Ohlin left Area 3 almost immediately after learning the hotel's location. *See* Nov. 8, 2004 Tr. 59. Area 3 headquarters is located at the intersection of Belmont and Western Avenues, which is less than one-half mile from an entrance to the Kennedy Expressway. The Holiday Inn at 8201 West Higgins is located less than one-half mile from an exit off the Kennedy. The two locations are less than ten miles apart.[2] At 1:00 a.m., it is reasonable to expect that traffic on the Kennedy would have been relatively light, and thus it likely would have taken less than a half hour for Warren and Ohlin to travel from Area 3 headquarters to the hotel.

These findings regarding the timing of the events are also supported by the notations the hotel clerk made in her log (which did not surface until after the agents and officers had testified regarding the sequence and timing of the events leading up to the signing of the consent form and the search of the hotel room and safe). The Court finds that as noted in the log, upon arriving at the hotel about 1:30 a.m., the agents approached the desk clerk with Bell's room key, asked her to "read" the key, and then entered the room, and that shortly afterward they asked the clerk to provide them with access to the safe. In light of all the evidence, and having given due consideration to the demeanor of the witnesses, the Court does not find believable the claim that despite the urgency of the situation, and the possibility that the kidnap victim was in the room, the agents waited a full forty-five minutes until Bell could be located and asked to consent.

---

[2] *See Lowrance v. Pflueger*, 878 F.2d 1014, 1018 (7th Cir. 1989); *Ikerd v. Lapworth*, 435 F.2d 197, 205 (7th Cir. 1970); *United States v. Duke*, 369 F.2d 355, 357 (7th Cir. 1966) (court may take judicial notice of distances between locations).

Rather, the entry and search were made before obtaining Bell's consent.

For this reason, to justify the search, the government must rely on the claim of exigent circumstances.[3] The Court finds this claim persuasive. The agents' belief that the kidnap victim could be in the hotel room was sufficient to permit them to enter the hotel room even had they not obtained the consent of the occupant, Bell's girlfriend. *See, e.g., United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994); *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993). The kidnappers had implicitly threatened to harm the victim if the ransom was not paid; the ransom had not been delivered as directed; and there had been at least one subsequent call from the kidnappers about the failure to deliver the ransom. Bell had denied knowledge of the kidnapping, but the agents had good reason to believe that he had lied to them about several matters, including his claim that he had checked out of the hotel room. This, combined with the fact that the kidnappers had entrusted him to pick up the ransom, gave the police a solid basis to believe that he had, and was withholding, information about the kidnap victim's whereabouts. From this the police reasonably could and did believe the victim might be in the hotel room.

The Court must determine separately, however, whether the claim of exigent circumstances justified the search of the safe without a warrant or consent. *See United States v. Rivera*, 825 F.2d 152, 157 (7th Cir. 1987) ("Once a room is legally entered under exigent circumstances, a subsequent search or seizure of items in the room must be justified by a warrant or an exception to the warrant requirement."). "A warrantless search must be strictly circumscribed by the exigencies which justify its initiation ...." *Mincey v. Arizona*, 437 U.S. 385,

---

[3] The government has not argued that consent obtained after the fact would have justified the search by way of the doctrines of independent source or inevitable discovery.

11

393 (1978). In the present situation, the search of the safe was proper only if an attempt to locate evidence that might lead the agents to the kidnap victim qualifies as exigent circumstances authorizing them to examine the contents of the safe.

Under the doctrine of exigent circumstances, "'[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Id.* at 392 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)). The Court has found no federal decisions discussing whether this doctrine permits a search not for a kidnap victim himself, but for evidence that might lead to his location. There are, however, a number of state court decisions that have approved warrantless searches of premises for evidence of the whereabouts of a kidnap victim who, like Colon, was reasonably believed by the police to be in imminent danger of physical harm.

One such case is *Chaney v. State*, 612 P.2d 269 (Okl. Crim. App. 1980). After receiving a report of a kidnapping, the police traced to the defendant's residence a call in which a ransom demand had been made. Soon thereafter, another call was received in which the caller threatened to kill the kidnap victims. The police responded by entering and searching the defendant's residence. In the course of the search, they found evidence that was introduced against him at a subsequent trial. The court upheld the warrantless entry and search on the ground that an emergency existed, even though the defendant claimed the police had the time to obtain a warrant. The court found that "an emergency effort to save the victims' lives was of paramount importance" and justified "a warrantless search for either the victims or evidence of their location." *Id.* at 277.

*People v. Lucero*, 44 Cal. 3d 1006, 750 P.2d 1342 (1988), is of similar effect. In that

12

case, the court upheld under the exigent circumstances doctrine a warrantless search that was undertaken to find two missing girls "or clues to their location." *Id.* at 1017-18, 750 P.2d at 1347. Similarly, in *Brimage v. State,* 918 S.W.2d 466, 483 (Tex. Crim. App. 1996), the court stated that what it termed the "emergency" doctrine justified a warrantless search for "evidence that would lead to a kidnap victim as well as searches for the victim himself," so long as probable cause existed and it was impracticable to obtain a warrant due to a reasonable belief there was an immediate need to act to protect live or prevent serious bodily injury.[4] *Accord, State v. Matthews,* 665 N.W.2d 28, 41 (N.D. 2003) (upholding search of defendant's house after police received a call that defendant and his employee were being held at gunpoint at an unknown location; there was a reasonable basis to believe that the search would produce the victims "or information leading to their location").

The Court likewise finds persuasive *People v. Bondi,* 130 Ill. App. 3d 536, 474 N.E.2d 733 (1984). In that case, a woman was reported missing by her cousin. In an attempt to find her or clues to her whereabouts, the police searched her home and surrounding property without a warrant. The police found the missing woman dead in a shallow grave on her property. Her husband was later charged with murder. He sought to suppress the fruits of the search. The court held that the search was proper, finding that the police had reason to believe that the missing woman was in serious danger; the primary intent of the search was to locate her, not seize evidence against her husband; and the police reasonably believed that a search of the

---

[4] The court in *Brimage* rejected the prosecution's contention that a search was justified by the emergency doctrine, as no emergency existed. *Brimage,* 918 S.W.2d at 483 ("The police were not expecting to find a body at the house, much less an alive and injured victim in need of assistance.").

residence was likely to turn up evidence of her whereabouts. *Id.* at 539-40, 474 N.E.2d at 736.

Courts must carefully circumscribe claims of exigent circumstances so that they do not overwhelm the Fourth Amendment's requirement of a warrant to justify a search of a home. "The exceptions to the rule that a search must rest upon a search warrant have been jealously and carefully drawn ...." *Jones v. United States*, 357 U.S. 493, 499 (1958). In the circumstances of this case, the fact that Colon was reasonably believed to be in danger of physical harm would not have given the police the authority to enter homes and conduct searches at will. Rather, those circumstances justified entry and search only if and to the extent there was an objectively reasonable basis to believe the particular search would result in finding him or evidence leading to his location.

A subjective belief that exigent circumstances exist is insufficient to justify a warrantless search. As the Seventh Circuit stated in a case involving entry to a swelling to locate a murder victim, "as is normally the case for Fourth Amendment inquiries, the test is objective: 'the government must establish that the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance.'" *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000) (quoting *Arch*, 7 F.3d at 1304).

The court is persuaded that the standard applied in *Bondi*, and by New York's highest court in *People v. Mitchell*, 39 N.Y.2d 173, 347 N.E.2d 607 (1976), appropriately circumscribes the authority of the police to search, based on a claim of an emergency, premises or a container when a warrant otherwise would be required: there must be reasonable grounds to believe an emergency is at hand requiring immediate assistance; the primary motive of the search must not

be to arrest or seize evidence; and there must be a reasonable basis to believe that the search will assist in resolving the emergency. *Id.* at 177-78, 347 N.E.2d at 609-10. To this the Court adds one further requirement: the prosecution must show that under the circumstances, obtaining a warrant would be impracticable or would defeat the purpose of the search. *See Brimage,* 918 S.W.2d at 482.

These requirements have been met in this case. As previously discussed, the police had a reasonable basis to believe that Colon was in imminent danger of serious physical harm. The same circumstances previously discussed gave the police a reasonable basis to believe that evidence leading to his whereabouts might be found in the hotel safe; the police reasonably believed that Bell was more involved in the kidnapping than he had claimed; and accordingly, that he might have secreted in the safe something that would help lead to others involved and to Colon.

The search took place at 1:30 a.m., within a few hours after the ransom drop demanded by the kidnappers had failed. The agents reasonably believed that the additional delay that finding a judge and obtaining a warrant in the middle of the night would necessitate might make their efforts to save Colon futile. It is true that a reasonable law enforcement officer in the agents' position would believe that a search of the safe might turn up narcotics: material of the type used to wrap quantities of cocaine had been found, and Bell's girlfriend said she thought he used the safe to store drugs. But the fact that evidence of other criminal offenses might be found in the safe did not require the officers to forego searching it. In view of Bell's dissimulation regarding the hotel room and his apparent withholding of information, the officers also had good reason to believe that the safe contained evidence regarding the kidnapping. The search for that

15

evidence, not the narcotics, was the primary reason why they examined the safe.

For these reasons, the Court finds that exigent circumstances permitted the agents to open and search the hotel room safe without a warrant.

### Conclusion

The Court denies defendant's motion to suppress evidence [docket # 19-1] for the reasons stated above.

                                                                                    _____
                                                                                    MATTHEW F. KENNELLY
                                                                                    United States District Judge

Date: February 9, 2005