IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Case No. 04 CR 202 |
| ) | |
| FRANCIS BELL ) | |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In October 2005, the Court sentenced Francis Bell to a prison term of twenty-five years (300 months) following his guilty plea to a charge of possession of a controlled substance with intent to distribute—a little over 800 grams of powder cocaine and about forty grams of crack cocaine. Twenty-five years is a rather lengthy sentence given the amount of narcotics involved, but there were two factors in Mr. Bell's case that distinguished it from the run-of-the-mill narcotics case.

First, Mr. Bell (who at the time of sentencing was thirty-two years old) had an unusually long and severe criminal history, including the following:

- two misdemeanor trespass offenses and a misdemeanor theft offense in 1991;
- a 1992 felony conviction for burglary to a motor vehicle;
- a 1993 felony conviction for possession of a firearm by a felon, which resulted in a prison term;
- a 1993 felony conviction for residential burglary, which resulted in a prison term concurrent to the firearm possession sentence;
- a 1995 felony conviction for aggravated discharge of a firearm, which resulted in a six-year prison sentence, followed by parole, which Mr. Bell violated in 2001;

- a 1997 trespass conviction;

- felony convictions in 1997 for possession of cannabis with intent to deliver and two separate convictions for possession of cocaine, which resulted in concurrent prison terms;

- a 2001 felony conviction for possession of contraband in a penal institution; and

- a 2004 felony conviction for possession of a switchblade by a felon, which resulted in a prison term.

Second, the narcotics charge on which the Court sentenced Mr. Bell in 2005 arose from was related to law enforcement's investigation of the kidnapping of a man named Jesus Colon. Mr. Colon was kidnapped and held for ransom. Arrangements were made for his wife to drop off $100,000 in a bag at or near the Logan Square subway station. Mr. Bell appeared at the location to pick up the bag. He attempted to flee when law enforcement tried to apprehend him, and he fought with officers when they caught him. Mr. Bell refused to provide information regarding the kidnapping. Law enforcement officers located a hotel room near O'Hare Airport where Mr. Bell had been staying, and they went there to search for evidence that might help them find Colon. The room had a locked safe later found to contain 810 grams of powder cocaine and about forty grams of crack cocaine. Mr. Bell admitted he put the narcotics there but claimed to be holding them for a friend whom he declined to identify.

The kidnappers who were holding Mr. Colon (not including Mr. Bell, who by this time had been arrested) tortured and killed Mr. Colon by using pliers on his testicles to force him to open his mouth and then stuffing a rag into his mouth and suffocating him to death. Several days later, to avoid detection, they dismembered Mr. Colon's body

with a chainsaw and a handsaw and removed his teeth and fingers with bolt cutters. Several of the men implicated in the kidnapping and murder implicated Mr. Bell, identifying him as having participated in the planning and execution of the kidnapping. Phone records also established Mr. Bell's repeated contacts with one of the kidnappers at the relevant time.

Mr. Bell faced a mandatory minimum sentence of ten years based on the government's filing of an information under 21 U.S.C. § 851 predicated on his previous narcotics convictions. However, Mr. Bell's advisory Sentencing Guidelines range was far higher than that—262 to 327 months imprisonment, based on a criminal history category of VI and a total offense level of thirty-four due to his "career offender" status (the Court overruled the government's contention that the offense level should be thirty-seven, which would have resulted in an advisory sentencing range of 360 months to life). As indicated earlier, the Court imposed a 300-month sentence, slightly above the middle of the advisory range. The Court notes that Mr. Bell had twenty-nine criminal history points, whereas category VI requires only 13.

Mr. Bell was held in custody continuously from his arrest on February 24, 2004. At this point he has served 201 months, a little short of seventeen years. He is currently serving his sentence at Gilmer FCI, and his anticipated release date, given good time credits, is April 26, 2026, about five years and four months from now.

Mr. Bell has filed a motion for early release under 18 U.S.C. § 3582(c)(1)(A). He cites his medical conditions and the risks posed by the coronavirus, as well as subsequent changes in the law regarding enhancements under 21 U.S.C. § 851. Bell suffers from hypertension, asthma, food allergies, and knee pain. There is no indication

that the latter two conditions put Mr. Bell at any higher risk if he contracts the coronavirus. Mr. Bell's hypertension, according to the Centers for Disease Control and Prevention, "might" put him at a higher risk for severe illness if he contracts the coronavirus. His asthma, which Mr. Bell told the probation office was "mild asthma," *see* Presentence Report at 16, and which his BOP medical records reference but do not categorize as either "severe" or "moderate" (a greater level of severity than "mild" asthma), likely does not increase his risk of severe illness from the virus. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last viewed Dec. 28, 2020).

As of today's date, there are sixteen inmates at Gilmer FCI who have currently tested positive for coronavirus and 149 others who previously tested positive and have recovered. https://www.bop.gov/coronavirus/ (last viewed Dec. 24, 2020). None are reported to have died from coronavirus disease. There are also five staff members currently tested as positive and seventeen who previously tested positive and have recovered. It is fair to say that the prison has experienced a significant incidence of coronavirus infections.

On the question of section 851 enhancements, the Court assumes for purposes of discussion that if Mr. Bell were being sentenced today, he would not be subject to a section 851 enhancement due to recent changes in the law. Congress did not make those changes retroactive, but that does not preclude the Court from considering later

changes to the law in deciding a compassionate release motion. The more important factor here is that the section 851 enhancement had no impact on Mr. Bell's sentence—it had the effect of setting the mandatory minimum at ten years, but the Court imposed a twenty-five year sentence.

Mr. Bell's motion is made under section 603(b) of the First Step Act, which amended 18 U.S.C. § 3582(c)(1)(A) to provide a greater role for courts in determining whether to reduce a defendant's sentence based on "extraordinary and compelling reasons" warranting a reduction. As amended, and as applicable here, the statute provides that

> [t]he court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction;
>
> . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).

At this point, Mr. Bell has satisfied the administrative exhaustion requirement. The Court assumes that his hypertension and the resulting risk to his health caused by

the coronavirus pandemic amounts to an "extraordinary and compelling reason[ ]" that would permit a sentence reduction. In addition, policy statements issued by the Sentencing Commission even before the passage of the First Step Act included an open-ended provision broad enough to cover the circumstances argued by Mr. Benion. *See* U.S.S.G. § 1B1.13, app. note 1(D). *See, e.g., United States v. Reyes*, No. 04 CR 970, 2020 WL 1663129, at *2 (N.D. Ill. Apr. 3, 2020) (Leinenweber, J.).

This, however, does not entitle Mr. Bell to a sentence reduction. Before a court may reduce a sentence, it must consider the factors regarding imposition of an appropriate sentence set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A). These include Mr. Bell's history and characteristics; the nature and circumstances of his crimes; due consideration of the seriousness of the crimes; promoting respect for the law; providing just punishment; affording adequate deterrence; protecting the public from further crimes by Mr. Bell; and providing him with any necessary services and treatment.

The amount of time served to date by Mr. Bell does not adequately account for the seriousness of his offense; the Court concluded as much when it sentenced him to a prison term totaling twenty-five years. In addition, Mr. Bell, who is now forty-seven years old, has a significant and aggravated criminal history, as the Court has detailed. Despite the fact that he had previously served a significant amount of time in jail and prison, Mr. Bell committed the serious crime to which he pled guilty in this case and was shown to have been involved in an even more serious and violent crime, specifically the kidnapping of Jesus Colon. Though Mr. Bell had no role in Mr. Colon's subsequent murder, that unfortunate outcome was certainly within the contemplation of the

offenders, including Mr. Bell, when they planned the kidnapping. Finally, although Mr. Bell has, admirably, pursued studies and courses while incarcerated to attempt to improve himself, prison records reflect that he has also incurred significant disciplinary infractions while incarcerated, including several serious infractions in the relatively recent timeframe of 2014 through 2017.

In short, although the Court acknowledges that Mr. Bell may be at a somewhat greater risk from the coronavirus, the need to protect the community and provide just punishment outweighs this risk and weighs against granting a sentence reduction. The Court is not persuaded that consideration of the factors in 18 U.S.C. § 3553(a) warrants a reduction of Mr. Bell's sentence.

## Conclusion

For the reasons stated above, the Court respectfully denies Mr. Bell's motion for compassionate release [97] [101]. Mr. Bell's motions to submit further briefing are granted [102] [104], and the Court has considered all of his submissions in ruling on his request for compassionate release. Mr. Bell's recently filed motion for expedited consideration [112] is terminated as moot. Mr. Bell remains fully eligible for release to home detention whenever the Bureau of Prisons deems that appropriate. The Clerk is directed to mail a copy of this Memorandum Opinion to Francis Bell, No. 16790-424, FCI Gilmer, P.O. Box 6000, Glenville, WV 26351.

Date: December 28, 2020

_____
MATTHEW F. KENNELLY
United States District Judge